**KRIDEL LAW GROUP**
1035 Route 46 East
Suite B-204
Clifton, New Jersey 07013
(973) 470-0800 – Telephone
(973) 472-1902 – Facsimile
law@kridel.com – Email
James A. Kridel, Jr., Esq.
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JAMES A. KRIDEL, JR.,**<br>**d/b/a KRIDEL LAW GROUP,** | **Civil No.:** |
| **Plaintiff,** | **COMPLAINT AND JURY DEMAND** |
| **v.** | |
| **FINDLAW, an assumed name, WEST**<br>**PUBLISHING CORPORATION, a**<br>**Minnesota Corporation, THOMSON**<br>**REUTERS HOLDINGS, INC., a Delaware**<br>**Corporation, JOHN AND JANE DOES I-V,**<br>**and ENTITIES I-V, as their interests may**<br>**appear,** | |
| **Defendants.** | |

Plaintiff, James A. Kridel, Jr., d/b/a the Kridel Law Group, by and through its attorneys, the Kridel Law Group, by way of Complaint against Defendants, FindLaw and Thomson Reuters Holdings, Inc., alleges as follows:

**JURISDICTION AND PARTIES**

1.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, and the parties are citizens of different states; such that complete diversity exists between Plaintiff and Defendants herein.

2. At all times relevant, Plaintiff, James A. Kridel, Jr., d/b/a the Kridel Law Group (hereinafter referred to as the "Plaintiff"), was a law firm, whose principal place of business was located at 1035 Route 46 East, Suite B-204, Clifton, Passaic County, New Jersey 07013.

3. At all times relevant, Defendant, FindLaw, was a corporation, whose principal place of business was located at 610 Opperman Drive, Eagen, Minnesota 55123.

4. At all times relevant, Defendant, West Publishing Corporation, was a Minnesota corporation whose principal place of business was located at 610 Opperman Drive, Eagen, Minnesota 55123.

5. At all times relevant, Thomson Reuters Holdings, Inc., was a foreign corporation with its principal place of business in the State of New York, organized under the laws of the State of Delaware, and authorized to do and was doing business in the State of New Jersey.

6. John and Jane Does I-V are fictitious names describing an affiliated person, persons, and/or individual representatives and/or agents of the Defendants who may have contributed to the wrongful conduct alleged herein or future parties who may be discovered throughout the course of discovery.

7. Entities I-V are fictitious names describing affiliated entities doing business in the State of New Jersey which are alter egos and/or agents of the Defendants.

8. At all times herein, Defendants shall be known collectively as "FindLaw."

## FACTS COMMON TO ALL COUNTS

9. Plaintiff is a law firm which operates a website with the following address: www.kridel.com (hereinafter referred to as the "Website").

10. FindLaw is a corporation which markets website development, search engine optimization (hereinafter referred to as "SEO"), Internet marketing, and other advertising services to attorneys within the United States.

11. Plaintiff hired FindLaw to increase its exposure to potential legal clients on the Internet after several months of in-person solicitation from FindLaw sales representatives at Plaintiff's office in Clifton, New Jersey.

12. Prior to Plaintiff's engagement of FindLaw, Plaintiff's marketing was limited solely to print advertising, specifically, advertising within the Yellow Pages.

13. FindLaw's sales representatives repeatedly advised Plaintiff that Plaintiff should allocate more of its marketing budget toward Internet marketing with FindLaw and less toward print advertising, with which Plaintiff agreed; and, in fact, Plaintiff subsequently discontinued its print advertising entirely, at which point Plaintiff advertised solely with FindLaw's products and services on the Internet.

14. As FindLaw introduced additional products and services, its sales representatives solicited Plaintiff at Plaintiff's place of business in New Jersey, to purchase same so as to remain competitive with other attorneys' websites, with which Plaintiff also agreed.

15. From inception to date, Plaintiff has had a de minimus understanding at best with respect to web hosting, SEO, graphic design, script-writing for platforms, and other aspects of the Website and Internet marketing; and, as a result, has solely relied on FindLaw for same.

16. To the best of Plaintiff's knowledge and based on its current records, since in or about 2005, Plaintiff has engaged FindLaw to develop and design its Website and to improve the SEO of the Website.

17. Plaintiff has paid FindLaw for its services since approximately 2005 through 2014. Plaintiff ceased payment in June of 2014 after receiving certain credits prior thereto, and was led to believe that it would receive credits going forward, through October 2014.

18. To date, Plaintiff has paid FindLaw in excess of Three Hundred Thousand ($300,000.00) Dollars.

19. During Plaintiff's relationship with FindLaw, FindLaw advised Plaintiff of various tactics with which FindLaw planned to undertake in order to promote the SEO of the Website, including, by way of illustration and not of limitation, splitting the Website into two separate websites with distinct practice areas; writing articles and blog posts for the Website regarding topics of current interest and relevant to Plaintiff's practice areas; creating additional pages of content; editing the existing content to include keywords and links; and, redesigning the Website with periodic "refreshes."

20. The sales representative assigned to Plaintiff, who regularly visited Plaintiff at its office to discuss FindLaw's products and the embellishment of same, ultimately left FindLaw.

21. The sales representative was replaced by another sales representative, whose name is currently unknown to Plaintiff, who insisted that for the Website's optimal performance, the Website would have to be split into two individual websites, for which Plaintiff would be obligated to pay additional fees and contribute months of work and input, at Plaintiff's own cost and expense, in order to assist FindLaw with the creation of content, which Plaintiff had perceived to be FindLaw's responsibility.

22. Subsequently, after the creation of the aforementioned two websites, traffic from visitors stopped almost entirely. Upon information later received from FindLaw's own sales representatives, the reason for the halt in traffic was due entirely to FindLaw's decision to

split the Website into two websites, which inexplicably initially did not even link to each other.

23. The sales representative who had insisted upon the two websites then left FindLaw and was replaced by another sales representative, who immediately advised Plaintiff that maintaining two websites was "a real no-no" in the business; and, that Plaintiff had been wasting its money, at which time the sales representative requested that FindLaw's development team combine the two websites into one website once again.

24. Upon information and belief, the tactics undertaken by FindLaw to purportedly improve the Website's SEO are "black hat SEO" tactics or "webspam," i.e., techniques that do not benefit users, instead looking for shortcuts or loopholes in search engine algorithms that would rank pages higher than they deserve to be ranked, in the pursuit of higher rankings and/or traffic.

25. Black hat SEO tactics have been widely perceived as unethical and, in fact, search engines have publicly advised that websites employing such tactics would be punished by decreased rankings and visibility in search results, or even complete removal from search results.

26. Frequent "refreshes" of the Website were additionally included in FindLaw's services but were never, or at most rarely performed, other than a change in the aesthetics and some Flash content that was written personally and provided to FindLaw by Plaintiff.

27. By way of illustration and not of limitation, Plaintiff's "Representative Cases" and "Representative Clients" webpages are severely outdated and, as of this date, are approximately ten (10) years old.

28. On one occasion, an account manager attempted a refresh with Plaintiff, for which Plaintiff undertook for several weeks; however, FindLaw then misplaced same and instead published an older version of the Website, unbeknownst to Plaintiff.

29. Plaintiff was forced to immediately recreate and rewrite the Website entirely due to numerous typographical and grammatical errors, as well as misinformation, and expended in excess of fifty (50) hours to do so. To date, FindLaw has not located this lost refresh.

30. For nearly ten (10) years, the Website has remained relatively static with respect to FindLaw's input, other than FindLaw's purported SEO changes that were implemented unbeknownst to Plaintiff, if any, as well as the two-website debacle.

31. Plaintiff has repeatedly demanded an accounting of FindLaw's services that were purportedly rendered, from inception to date; however, FindLaw has consistently refused to provide same to Plaintiff.

32. Many of the issues and disputes that have arisen during the course of Plaintiff and FindLaw's relationship have been caused by a complete lack of knowledge regarding Plaintiff's goals and desires for the Website, as well as the nature of Plaintiff's Firm and areas of expertise, which was further exacerbated by a revolving-door turnaround in FindLaw personnel.

33. By way of illustration and not of limitation, Plaintiff, while attempting to negotiate the matter with Jessica Langenfeld (hereinafter referred to as "Langenfeld"), its account manager at the time, received an automatic reply email that Langenfeld had been promoted and would no longer be Plaintiff's account manager. Thereafter, Logan Pinckney (hereinafter referred to as "Pinckney") called to announce that he was

Plaintiff's new account manager, and proceeded to describe Plaintiff as "a bankruptcy firm"; Pinckney knew nothing of Plaintiff's expertise, which represents ninety percent of its business in litigation and tax law. Plaintiff immediately notified Langenfeld of this conversation, upon which Langenfeld replaced Pinckney as Plaintiff's account manager, notwithstanding the previous statement that she had been promoted.

34. By way of illustration and not of limitation, Plaintiff again received an automatic reply email upon subsequently attempting to contact Langenfeld, which advised that Langenfeld had left FindLaw. No introduction was made to Plaintiff's replacement account manager until Plaintiff initiated contact with its sales representative, who advised that Plaintiff would have to wait to be contacted by its newest account manager, Sheila Regan (hereinafter referred to as "Regan").

35. By way of illustration and not of limitation, Regan once replied to Plaintiff's inquiries regarding its account to merely advise that she would be out of the office at a doctor's appointment and out of the office entirely for the remainder of that week.

36. By way of illustration and not of limitation, Plaintiff's current sales representative has stopped responding to Plaintiff's telephone calls and voicemails entirely, as well as Plaintiff's emails; and, to date, has not contacted Plaintiff despite its numerous requests for same.

37. During the pendency of Plaintiff's relationship with Langenfeld, Plaintiff was receiving de minimus calls and its Website was in a total state of disarray, such that Langenfeld, Plaintiff's sales representative, and Plaintiff negotiated credits due to Plaintiff's refusal to pay for services that were not being rendered, some of which were ultimately granted with the understanding that all parties would work toward a resolution of the matter and

when same had been reached, Plaintiff would resume payment prospectively. This never happened.

38. The few calls and inquiries that Plaintiff did receive as a result of the Website were largely irrelevant to Plaintiff's practice and, therefore, useless.

39. During Plaintiff's discussions and disputes with FindLaw, Plaintiff discovered that FindLaw had been charging Plaintiff for several years on a monthly basis for articles when, in fact, only one (1) article had been written and same discussed an area of law in which Plaintiff did not actively practice.

40. FindLaw repeatedly blamed Plaintiff for not timely approving one article as FindLaw had erroneously and irresponsibly assumed that, as a result, same apparently signified Plaintiff's acquiescence that FindLaw would not have to prepare any other articles, despite Plaintiff's continued payments for years.

41. Ultimately, FindLaw agreed to discontinue invoicing Plaintiff for articles that had never been written.

42. During these discussions, Plaintiff additionally discovered that FindLaw had been charging Plaintiff for several years on a monthly basis for blog posts. Same were ultimately canceled by FindLaw as well.

43. Notwithstanding Plaintiff's payment for the aforementioned articles and blogs, it is extremely doubtful that Plaintiff received any services or benefits with respect to the articles and blogs.

44. FindLaw repeatedly advised Plaintiff that "content was king" and would drive traffic to the Website; however, when Plaintiff attempted to provide FindLaw with content, Plaintiff was refused and advised instead that the aesthetic changes to the layout needed

to be made first. Additional time was wasted in assisting FindLaw with the selection of images and graphics for the Website from a third-party stock image service, as FindLaw could not produce a design that accurately reflected Plaintiff's Firm without extensive assistance and input, despite its longstanding relationship with Plaintiff. For the entire duration of the aesthetics changes, which spanned several months, Plaintiff continued to request that content revisions be undertaken by FindLaw, yet FindLaw adamantly refused to discuss same with Plaintiff.

45. Once FindLaw consented to performing Plaintiff's content revisions, FindLaw sent Plaintiff documents spanning one hundred and two (102) pages for Plaintiff's review and revision at a time when Plaintiff was unable to do so. Plaintiff had previously budgeted time to participate in FindLaw's content revision, but same had been expended for the aesthetics changes due to FindLaw's insistence.

46. Plaintiff continued to correspond with FindLaw by email and telephone, and ultimately returned ninety-two (92) of the pages, with extensive corrections, to FindLaw; however, FindLaw ultimately blamed Plaintiff for not completing the work timely that Plaintiff had presumed was FindLaw's responsibility.

47. To date, the remaining ten (10) pages of content have not been corrected or published, notwithstanding the fact that four (4) of those ten (10) pages had already been corrected and FindLaw had been advised of same since June 9, 2014.

48. Despite Plaintiff's concerted efforts to reconcile its issues with FindLaw, FindLaw has repeatedly blamed Plaintiff for the Website's failure to produce results, while simultaneously demanding payment for services that were never rendered.

49. By way of illustration and not of limitation, Regan advised Plaintiff that if Plaintiff did not make payment for services which Plaintiff insisted were not performed, she would "shut [Plaintiff] down," which effectively created a chilling effect on Plaintiff's ongoing efforts to negotiate with FindLaw.

50. By way of illustration and not of limitation, Kerry Huffman, supervisor to Regan (hereinafter referred to as "Huffman"), as well as Langenfeld, had previously led Plaintiff to believe that Plaintiff would receive its requested credits in consideration for Plaintiff's resumed payment in November 2014, if the content had been substantially completed, in order to reconcile the relationship. Before this could occur, Huffman sent a further email ignoring the agreement which had been unquestionably made, and advised that unless payment was made on October 31, 2014, the Website would be discontinued, leaving Plaintiff without any means of advertising after having spent approximately Three Hundred Thousand ($300,000.00) Dollars.

51. On November 3, 2014, in an effort to protect itself, Plaintiff transferred the Website to another server.

## FIRST COUNT
## CONSUMER FRAUD

52. Plaintiff repeats and re-alleges the allegations of the proceeding paragraphs one (1) through fifty-one (51) as if same were set forth at length herein.

53. FindLaw's business practices constitute the employment of an unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, and the knowing concealment and omission of material facts with the intent that Plaintiffs would rely upon such concealment and omission. Primarily, the conduct which constitutes consumer fraud

and/or unconscionable commercial practices are the material misrepresentations made by FindLaw.

54. By way of illustration and not of limitation, FindLaw employed numerous black hat SEO tactics in the development of Plaintiff's Website, with the knowledge that the Website would likely be penalized by sophisticated search engine algorithms designed to uncover such black hat tactics, without any notification to Plaintiff that such tactics were being used and the full extent of the consequences thereof.

55. Specifically, FindLaw represented to Plaintiff that its Website was to be split into two websites in order to enhance website traffic, which proved to be materially false.

56. FindLaw further represented to Plaintiff that FindLaw would be proactive and assist in the constant updating of Plaintiff's "Representative Cases" and "Representative Clients" webpages; however, FindLaw never updated same.

57. Additionally, FindLaw had promised Plaintiff that it would write monthly articles and timely blog posts for the Website, which would be relevant to the work Plaintiff performed and would enhance traffic to the Website, which said representations proved to be materially false; the articles and blog posts produced were irrelevant and did not contribute to Plaintiff's business. FindLaw only wrote one (1) article, totally contrary to its monthly invoices and representations to Plaintiff.

58. FindLaw advised Plaintiff on numerous occasions that FindLaw would proofread the Website's content for typographical and grammatical errors, which said representations proved to be materially false; until recently, Plaintiff's Website was fraught with errors and, to date, still contains errors.

59. The foregoing list is by way of illustration and not of limitation.

60. FindLaw's conduct constitutes an unconscionable commercial practice pursuant to the Consumer Fraud Act, and Plaintiff has suffered ascertainable losses.

**WHEREFORE**, Plaintiff demands Judgment against Defendant, as follows:

A.  For compensatory and consequential damages;

B.  For treble damages, pursuant to <u>N.J.S.A.</u> 56:8-19;

C.  For a refund of all monies acquired by means of the unlawful consumer fraud, less any reasonable benefit that may have been conferred;

D.  Awarding Plaintiff attorney's fees and costs of suit, pursuant to <u>N.J.S.A.</u> 56:8-19;

E.  For interest; and,

F.  For such other and further relief as the Court may deem equitable and just.

## <u>SECOND COUNT</u>
## <u>BREACH OF GOOD FAITH AND FAIR DEALING</u>

61. Plaintiff repeats and re-alleges the allegations of the proceeding paragraphs one (1) through sixty (60) as if same were set forth at length herein.

62. In the spirit of <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396 (1997), FindLaw acted in bad faith during the pendency of its relationship with Plaintiff, by in effect failing to perform even basic services, notwithstanding the fact that FindLaw continued to charge for same as if the services were still being performed when, in fact, they were not.

63. FindLaw, in its contractual responsibility with Plaintiff, had the obligation to act in good faith and fair dealing in the performance of its obligations.

64. For the reasons as aforesaid, FindLaw breached its duty of good faith and fair dealing to Plaintiff.

65. FindLaw's conduct has caused injury to Plaintiff.

**WHEREFORE**, Plaintiff demands Judgment against Defendant, as follows:

A.  For compensatory damages; and,

B.  For such other and further relief as the Court may deem equitable and just.

### THIRD COUNT
### BREACH OF CONTRACT

66. Plaintiff repeats and re-alleges the allegations of the proceeding paragraphs one (1) through sixty-five (65) as if same were set forth at length herein.

67. FindLaw breached its agreement with Plaintiff by failing to perform, preventing and/or hindering Plaintiff from performing, and placing Plaintiff under duress by threatening to shut down the Website due to Plaintiff's refusal to pay for services that were not rendered. Simply stated, FindLaw failed to perform the promised services.

68. The aforesaid breach caused loss and/or prevented gain to Plaintiff, which said breach caused damage to Plaintiff.

**WHEREFORE**, Plaintiff demands Judgment against Defendant, as follows:

A.  For consequential damages; and,

B.  For such other and further relief as the Court may deem equitable and just.

### FOURTH COUNT
### FRAUD IN THE INDUCEMENT

69. Plaintiff repeats and re-alleges the allegations of the proceeding paragraphs one (1) through sixty-eight (68) as if same were set forth at length herein.

70. Plaintiff was induced into its agreement with FindLaw by FindLaw's fraudulent and material misrepresentations as aforementioned.

71. Said false representations were made knowingly and intentionally by FindLaw, upon which Plaintiff reasonably relied in agreeing to engage FindLaw's services.

72. As aforementioned, Plaintiff relied upon FindLaw's purported expertise in Internet marketing from inception to date, eventually choosing to eliminate its print advertising altogether upon FindLaw's further advisement, and did not have any meaningful knowledge as to the development of websites.

73. FindLaw promised to create a website for Plaintiff which would describe the primary services offered by Plaintiff and, in effect, draw traffic by telling the public why they should choose Plaintiff. However, in practice, FindLaw failed to ever take the time to learn what Plaintiff did or what Plaintiff wanted to do for the public. Instead of a custom website, FindLaw produced a cookie-cutter website that did not reflect Plaintiff's practice.

74. Further, FindLaw promised Plaintiff that FindLaw would provide a team of experts, who would work directly with Plaintiff so as to assimilate with the Firm and be able to construct an accurate online presence for Plaintiff's practice and the clients Plaintiff sought to attract.

75. FindLaw was well aware of the fact that it did not have the ability to do this and, in fact, did not do this, due to their large number of clients and constant turnover of personnel.

76. As a result of FindLaw's unconscionable practices, omissions, and affirmative misrepresentations, Plaintiff was damaged.

**WHEREFORE**, Plaintiff demands Judgment against Defendant, as follows:

A.  For compensatory damages;

B.  For punitive damages; and,

C.  For such other and further relief as the Court may deem equitable and just.

Dated: November 7, 2014

                                              Respectfully submitted,

                                              KRIDEL LAW GROUP
                                              Attorneys for Plaintiffs

By:    s/ James A. Kridel, Jr.
                  JAMES A. KRIDEL, JR., ESQ., Senior Partner

## DEMAND FOR JUDGMENT AND TRIAL BY JURY

On the basis of the aforementioned allegations set forth herein, Plaintiff demands Judgment against Defendant for the above-stated relief, in a trial by jury.

Dated: November 7, 2014

                                              Respectfully submitted,

                                              KRIDEL LAW GROUP
                                              Attorneys for Plaintiffs

By:    s/ James A. Kridel, Jr.
                  JAMES A. KRIDEL, JR., ESQ., Senior Partner